


*U.S. Department of Justice*

*United States Attorney*
*District of Maryland*
*Northern Division*

---

Rod J. Rosenstein
United States Attorney

James G. Warwick
Assistant United States Attorney

36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201

DIRECT: 410-209-4860
MAIN: 410-209-4800
FAX: 410-962-3124
TTY/TDD: 410-962-4462
James.Warwick@usdoj.gov

January 18, 2013

Gary Christopher, Esquire
Assistant Federal Public Defender
100 South Charles Street
Tower Two
Baltimore, MD 21201

   Re: United States v. Antonio McKiver
     <u>Criminal No. CCB-12-0403</u>

Dear Mr. Christopher:

  This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. The terms of the agreement are as follows:

### Offenses of Conviction

  1. The Defendant agrees to plead guilty to Counts One, Two and Four of the Indictment now pending against him, which charges him with Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire (18 U.S.C. § 1958), Possession with the Intent to Distribute Heroin (21 U.S.C. § 841 (a)(1)), and Possession of a Firearm by a Convicted Felon (18 U.S.C. § 922(g)(1)). The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offense

  2. The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

Count One: Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire
  (18 U.S.C. § 1958)
  a. The Defendant intended that a murder be committed in violation of the laws

        of any State or the United States;

    b.    That the murder would be committed as consideration for the receipt of, or as consideration for a promise or agreement to pay anything of pecuniary value; and

    c.    The defendant did use interstate commerce facilities, including cellular phones and the United States Postal Service, in furtherance of the intended murder.

Count Two:    Possession with the Intent to Distribute Heroin (21 U.S.C. § 841 (a)(1))

    a.    The Defendant possessed a kilogram or more of a mixture or substance containing a detectable amount of heroin;

    b.    The Defendant knowingly possessed that heroin: and

    c.    The Defendant intended that the heroin he possessed would be distributed to others.

Count Four:    Possession of a Firearm by a Convicted Felon (18 U.S.C. § 922(g)(1))

    a.    The Defendant possessed firearms, specifically a .40 caliber Smith and Wesson semi-automatic pistol as well as a Mossberg Model 500 20 gauge shotgun;

    b.    The possession of the firearms was knowing and unlawful;

    c.    The firearms had traveled in or had affected interstate or foreign commerce; and

    d.    At the time the Defendant possessed said firearms, he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year.

### Penalties

3.    The maximum sentence provided by statute for the offenses to which the Defendant is pleading guilty is as follows: Count One-- ten years imprisonment, a $250,000 fine and supervised release of not more than three years; Count Two--life imprisonment, a $10,000,000 fine pursuant to 21 U.S.C. § 841 (b)(1)(A), followed by a term of supervised release of not more than five years (**A mandatory minimum sentence of ten years is applicable to Count Two**); Count Four–ten years imprisonment, a $250,000 fine, and supervised release of mot more than three years. However, **a mandatory minimum sentence of fifteen years under 18 U.S.C. § 924(e) is**

Revised 11/5/09

*and a maximum of life in prison* copy 3/21/13

applicable to Count Four should the Court determine that the defendant is an Armed Career Criminal. In addition, the Defendant must pay $300.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

    e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

    g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

    h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

 5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

 6. (a) This Office and the Defendant understand, agree and stipulate to the following Statement of Facts which this Office would prove beyond reasonable doubt, and to the following applicable sentencing guidelines factors:

On June 7, 2012 a confidential source (CS) met with the Defendant Antonio McKiver at McKiver's residence at 4402 Saint Thomas Avenue, Baltimore City, Maryland to discuss McKiver's willingness to take a "murder contract." This conversation was consensually

4

recorded. A review of the recording revealed that when presented with the possibility of a "murder contract" McKiver responded, "that ain't no problem....Tell him we'll take care of that...give us the address, a picture, whatever, and we'll take care of that... that's not a problem...I'll jump right on it." When asked how he wanted to be paid for the murder, McKiver responded that he wanted cash but was also interested in obtaining drugs to sell on the street.

On June 13, 2012, an undercover agent (UCA) of the Federal Bureau of Investigation (FBI) was introduced to and spoke with McKiver in a hotel room located in Baltimore County. The meeting was consensually recorded. A review of this recording indicated that McKiver agreed to commit a murder of a drug associate of the UCA in return for the payment of $15,000. McKiver also negotiated with the UCA to receive, on consignment from the UCA, a kilogram of drugs. McKiver stated, "I usually want 15 ($15,000), you know what I mean, but I told him that if it was easy, there's no problem...but if it is a dude that's packing, he's carrying motherfuckers with him." When asked about a gun McKiver stated, "I'd rather you give me something...automatic...9 Berreta, but Berreta is the best...but any other 9 will do."

It is common in contract killings for the "hitman" to be supplied with the murder weapon by the individual requesting the killing. The preference, of course, is for a firearm that cannot be traced back to either the "hitman" or the person requesting the killing. The UCA and McKiver agreed that the UCA would provide McKiver with a telephone with which McKiver and the UCA would communicate regarding the details of the contract killing. McKiver provided the UCA with a telephone number so that the UCA could contact McKiver to coordinate the delivery of the phone. McKiver also stated, "I'm not going by myself, we going to put two guns on him to make sure he don't get up." McKiver explained, "When I see him at the hotel I'ma (sic) try to do it that same day, catch him somewhere, like right when he leaving the hotel...I can handle it. It's not my first rodeo."

On June 22, 2012 a call was placed by the UCA to the telephone number provided by McKiver. This call was consensually recorded. During this call the UCA asked McKiver for an address to send the phone. The UCA had previously instructed McKiver that he was going to provide him with a phone to coordinate the contract killing. The UCA also explained that he would send money to McKiver as a small down payment. McKiver provided the UCA with his home address, 4402 Saint Thomas Avenue, Baltimore City, Maryland as the address to send the phone and money.

During discussions with McKiver, the UCA represented that he was a drug dealer who operated out of the Bronx, New York. On June 28, 2011, law enforcement agents traveled to the Bronx, New York and placed a package containing a cellular telephone and $600 in U.S. currency in the mail to McKiver at 4402 Saint Thomas Avenue, Baltimore, Maryland. On July 3, 2012, the UCA received a call from McKiver from a different cellular phone. In this call, McKiver stated that he received the phone and the money in the mail but explained that the prepaid phone was not working. The UCA walked McKiver through the process of activating the phone. The UCA then placed a call to the prepaid phone provided to McKiver to insure that it was in fact activated and working properly. McKiver answered the phone at which time the UCA explained in coded terms that the 'target' of the murder contract will be in Baltimore in a few weeks. The UCA stated, "the driver that I want you to meet is going to be there like the last week, so when I get up there probably, week and half, up there and then, and he's going to come down to your area. So you can hook up with the truck. Okay?" McKiver replied, "Okay, that'll work. Appreciate it."

5

On July 23, 2012, the UCA met with McGiver in the parking lot of a hotel in Baltimore County, Maryland. The UCA gave McGiver $5,000 in currency, a kilogram of heroin, and a .9mm semi-automatic pistol. The UCA also described the intended victim in detail to McGiver, and the UCA pointed out the vehicle that the intended victim was using. After the UCA left the area, and while McGiver waited in the parking lot for the intended victim to leave the hotel and walk to his car, McGiver was arrested.

Agents also searched the residence of McKiver under the authority of a search warrant. They recovered a .40 caliber Smith and Wesson semi-automatic pistol as well as a Mossberg Model 500 20 gauge shotgun from his residence. Both firearms had been manufactured outside of Maryland and had traveled in interstate or foreign commerce. The firearms were examined and found to be capable of expelling a projectile by the action of an explosive. At the time McKiver possessed these firearms, he had previously been convicted of at least one crime punishable by a term of imprisonment exceeding one year. Lastly, the heroin possessed by McKiver was intended for distribution.

The aforementioned conduct constitutes the crimes of Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire (18 U.S.C. § 1958), Possession with the Intent to Distribute Heroin (21 U.S.C. § 841 (a)(1), and Possession of a Firearm by a Convicted Felon (18 U.S.C. § 922(g)(1). For Count One, U.S.S.G. Section 2E1.4 establishes a base offense level of 32. For Count Two, U.S.S.G. Section 2D1.1(c)(4) establishes a base offense level of 32 in that more than one kilogram but less than three kilograms of heroin was the subject of the instant offense. For Count Four, a base offense level of 34 applies as the Defendant admits that he is an Armed Career Criminal as defined by U.S.S.G. Section 4B1.4 and 18 U.S.C. Section 924(e), in that he has previously been convicted of three violent felonies and/or serious drug offenses. Those offenses include the crimes of Possession with the Intent to Distribute Heroin (PPI @ Par 12), Robbery with Deadly Weapon (PPI @ Par. 15), and Possession with the Intent to Distribute Heroin (PPI @ Par 26).[2]

Under U.S.S.G. Section 3D1.2, Counts Two and Four are grouped. Count One is not grouped. The highest offense level is 34 under Count Four. Two additional levels are added under Section 3D1.4 as two units are assessed, which raises the **total offense level to 36.** The Criminal History Category is VI.

(b) The United States does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for her criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. **The net offense level is 33.** This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting

---

[2]PPI refers to the Pre-Pleading Investigation completed by United States probation in this matter.

statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. **The Advisory Guideline Range, at level 33, Criminal History VI, is from 235-293 months.**

**(c) The Defendant, however, cannot be sentenced on Count Two to less than ten (10) years under the mandatory minimum set forth in 21 U.S.C. Section 841 (b)(1)(A) or fifteen (15) years on Count Four under 18 U.S.C. Section 924(e) unless a motion is made by the United States pursuant to Guidelines Section 5K1.1 and 18 U.S.C. Section 3553 (e). The Defendant is not 'safety valve' eligible under Guideline Section 5C1.2 and 18 U.S.C. 3553(f) because he has at least three prior felony convictions and will be assessed more than one criminal history point.**

7. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8. This Office and the Defendant agree that with respect to the calculation the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute. The Defendant may raise factors contained in 18 U.S.C. §3553(a) in mitigation of sentence. The Defendant also agrees to forfeit the firearms which are the subject of the offenses of conviction herein.

### Obligations of the United States Attorney's Office

9. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant and will recommend a sentence at some point within the applicable guideline range.

10. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

### Waiver of Appeal

11. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

    a) The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

7

b) The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed, including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release. Nothing in this agreement shall be construed to prevent either the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), and appealing from any decision thereunder, should a sentence be imposed that is illegal or that exceeds the statutory maximum allowed under the law or that is less than any applicable statutory mandatory minimum provision. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

12. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

13. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will

consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

14. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,
Rod J. Rosenstein
United States Attorney

By: _____
James G. Warwick
Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

1-31-13                               _____
Date                                  Antonio McKiver

I am Mr. McKiver's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

1-31-13                               _____
Date                                  Gary W. Christopher, Esq.